UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAY COLLIER,

                           Plaintiff,

   -against-

NANCY A. BERRYHILL, *acting commissioner of Social Security*,

                         Defendant.

CIVIL ACTION NO.: 18 Civ. 8936 (SLC)

**OPINION AND ORDER**

**SARAH L. CAVE,** United States Magistrate Judge.

## I.   INTRODUCTION

Plaintiff Jay Collier ("Mr. Collier") commenced this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended, 42 U.S.C. § 405(g).  He seeks review of the June 12, 2017 decision by the Commissioner (the "Commissioner") of the Social Security Administration ("SSA"), denying his application for Disability Insurance Benefits ("DIB") benefits under the Act.  (ECF No. 1).  Mr. Collier contends that the decision of the Administrative Law Judge ("ALJ") was "not supported by substantial evidence and applie[d] an erroneous standard of law."  (Id. ¶ 5).  Mr. Collier asks the Court to set aside the Commissioner's decision and award benefits, or alternatively, remand the case for a new hearing.  (Id. ¶ 6).

On April 26, 2019, Mr. Collier moved for Summary Judgment, and on June 19, 2019, the Commissioner cross-moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure Rule 12(c).  (ECF Nos. 14, 16).  For the reasons set forth below, the Commissioner's motion for judgment on the pleadings is GRANTED and Mr. Collier's motion for summary judgment is DENIED.

## II.   <u>BACKGROUND</u>

### A.  <u>Procedural History</u>

On August 13, 2014, Mr. Collier filed an application for DIB benefits, claiming that he had been unable to work since September 1, 2013 because of the following conditions: tinnitus, peripheral neuropathy, abnormally high blood pressure, borderline diabetes, back pain, and carpal tunnel syndrome. (SSA Administrative Record ("R.") 89–90 (ECF No. 13)). On November 14, 2014, the SSA denied Mr. Collier's application, finding that he was not disabled. (R. 100–01). Mr. Collier timely appealed and requested a hearing before an ALJ. (R. 109).

On November 8, 2016, Mr. Collier appeared before ALJ Robert Gonzalez for an evidentiary hearing, after which Mr. Collier amended his alleged onset date to February 9, 2013. (R. 19, 259). On June 12, 2017, the ALJ issued a decision finding that Mr. Collier was not disabled under the Act. (R. 16–30). Although he found that Mr. Collier had twelve severe impairments—tinnitus, carpal tunnel syndrome, diabetes mellitus, peripheral neuropathy, plantar fasciitis, calcaneal spur, lumbar degenerative disc disease, obesity, acute gouty arthropathy, diastolic dysfunction, Dequervian's syndrome, and hypertension (R. 21)—ALJ Gonzales concluded that the severity of Mr. Collier's impairments did not meet or medically equal the requisite criteria for finding a disability. (R. 22). On July 27, 2018, the SSA Appeals Council denied Mr. Collier's request for review. (R. 1).

On September 28, 2018, after exhausting his administrative remedies, Mr. Collier filed a complaint in this Court, arguing that the ALJ's decision was "not supported by substantial evidence and applie[d] an erroneous standard of law." (ECF No. 1 ¶ 5).

**B. Factual Background**

**1. Non-medical evidence**

Mr. Collier was born on December 22, 1965. (ECF No. 15 at 4). He completed high school and had no further formal education. (R. 40, 43). He testified that he lived with his wife and two children, along with his sister and brother-in-law. (R. 49, 57–58). From 1999 until 2009, Mr. Collier worked as a construction machinery operator, operating heavy machinery such as excavators and backhoes. (R. 45). His last day of work was October 1, 2009. (R. 41).

**2. Medical evidence**

The below summary of the medical evidence will discuss the records provided during the relevant time period, starting from the alleged onset date of February 9, 2013, through December 31, 2014, the last insured date. (R. 19).

**a) Dr. Silvio Ceccarelli, treating physician**

On October 2, 2013, Mr. Collier presented to his primary care doctor complaining of left ankle pain and foot pain. (R. 447). Dr. Ceccarelli noted that Mr. Collier's pain was severe, but that the x-rays were negative. (R. 447). Dr. Ceccarelli diagnosed acute gouty arthropathy, a type of joint disease caused by the formation of uric acid crystals in a joint space. (R. 449). He discussed Mr. Collier's diet, ordered labs, and directed him to follow up in one week. (R. 449). The medical note also included Mr. Collier's history of chronic tinnitus and insomnia. (R. 447). On October 19, 2013, Mr. Collier saw Dr. Ceccarelli for a follow-up appointment, at which he stated that the pain in his foot was markedly better. (R. 455). The doctor directed Mr. Collier to stay hydrated, not drink beer, and watch his diet to help prevent attacks of gout. (R. 457).

On January 16, 2014, Mr. Collier presented to Dr. Ceccarelli complaining of numbness and pain in his hands that caused him to drop things, a burning sensation in his feet, and that

"everything hurt[]." (R. 632). He described symptoms of fatigue, joint pain and swelling, and numbness and stiffness in his joints. (R. 633). Dr. Ceccarelli found that Mr. Collier's foot sensations were diminished, and diagnosed peripheral neuropathy. (R. 634). He also diagnosed severe carpal tunnel syndrome, ordered imaging, and noted that Mr. Collier should see a neurologist. (R. 634). The progress note also stated that Mr. Collier had stopped taking his medications. (R. 634). The x-rays ordered by Dr. Ceccarelli found no abnormalities in Mr. Collier's right knee, despite his complaints of pain. (R. 628).

On March 15, 2014, Dr. Ceccarelli saw Mr. Collier to follow-up on his recent hospitalization for a hypertensive emergency. (R. 645). Mr. Collier explained that his feet were numb and painful, and that while at his podiatrist, his blood pressure was found to be extremely high, and he was transferred to the hospital. (R. 281, 491, 645). Dr. Ceccarelli diagnosed unspecified essential hypertension, prescribed blood pressure medication, and advised Mr. Collier to follow a low fat, low glycemic diet, and to follow up with a neurologist. (R. 647). On March 31, 2014, Mr. Collier appeared for a follow-up appointment, at which Dr. Ceccarelli noted that his blood pressure was controlled. (R. 471).

On August 13, 2014, Mr. Collier came in complaining of upper back pain radiating down his right hand that was exacerbated by movement. (R. 494). Dr. Ceccarelli noted that the neurological exam was normal, and that the symptoms seemed to be chronic as described by Mr. Collier. (R. 496). Dr. Ceccarelli directed Mr. Collier to manage the pain with Tylenol #3 and to follow up with a neurologist. (R. 497).

At an October 21, 2014 appointment, Mr. Collier stated that he had stopped taking his blood pressure medication because it was not working, and that he was still experiencing muscle

pain and numbness in his hands and feet. (R. 513–14). Dr. Ceccarelli explained the risk of uncontrolled hypertension, and started Mr. Collier on new blood pressure medication. (R. 515). On December 30, 2014, Mr. Collier presented again with painful and numb feet. (R. 517). Dr. Ceccarelli noted that Mr. Collier's blood pressure was not under ideal control, and directed Mr. Collier to follow up in two weeks. (R. 519). However, the record reflects that Mr. Collier did not see Dr. Ceccarelli again until May 19, 2015, when he presented with severe back pain after using a riding lawnmower. (R. 526). He also reported symptoms of general soreness, neuropathic pain, and hand numbness. (R. 526). Dr. Ceccarelli noted that Mr. Collier had several tender points in his upper and lower back, as well as limited range of motion in his shoulders, and noted that Mr. Collier was not monitoring his diabetes. (R. 526–27). Dr. Ceccarelli diagnosed unspecified muscle pain and unspecified muscle inflammation and prescribed Naproxen and Tramadol for the pain. (R. 528).

On October 28, 2016, Dr. Ceccarelli completed a medical source statement as part of Mr. Collier's SSA application. (R. 673–80). As a preliminary matter, he noted that he had been treating Mr. Collier since 2014, as needed, with the last visit on October 24, 2016. (R. 673). Dr. Ceccarelli noted his diagnosis of chronic back and generalized pain, that was not relieved with medication, and stated that Mr. Collier suffered from generalized and severe pain and numbness, with the pain being a level ten out of ten. (R. 673–74). Dr. Ceccarelli noted that medications, including NSAIDS, gabapentin and tramadol did not relieve the pain, and that he believed these symptoms were expected to last at least twelve months. (R. 674–75). Dr. Ceccarelli opined that Mr. Collier's impairments were reasonably consistent with his reported symptoms, and that the symptoms were severe enough to "constantly" (defined as over 2/3 of an 8-hour workday)

interfere with Mr. Collier's attention and concentration. (R. 675). Dr. Ceccarelli concluded that Mr. Collier was incapable of even low stress work, and that he was unable to sit, stand, or walk continuously without needing to change position. (R. 677). Dr. Ceccarelli noted that Mr. Collier could occasionally lift up to ten pounds, but never more, and that he could only use his hands for 50% of the workday. (R. 679).

On November 1, 2016, Dr. Ceccarelli replied to a request for clarification of his medical source opinion from ALJ Gonzales. (R. 744). In his response, Dr. Ceccarelli stated that he had no expertise in evaluating functional limitations, and that he considered records from Mr. Collier's orthopedist, neurologist and rheumatologist, in addition to his own exams in reporting his findings. (R. 744). Dr. Ceccarelli did not answer the question, "how long did your evaluation(s) of the claimant's limitations take and what examinations did you perform," and in response to the question, "[h]ave you specifically asked the patient to perform any of the activities or movements for which you have identified a limitation?" Dr. Ceccarelili, replied, "No . . . I am his primary care physician." (R. 745). Dr. Ceccarelli stated that the limitations included in his earlier submission were based on imaging and Mr. Collier's descriptions of his pain, and that he was not paid to complete the forms. (R. 745–46).

### b) Dr. Andrew Decker, neurology

On March 18, 2014, Mr. Collier saw Dr. Andrew Decker for a neurology consultation. (R. 685). Mr. Collier explained that he had a history of gout, chronic tinnitus, was borderline diabetic, and had suffered from numbness in his feet and hands. (R. 685). He described a burning and tingling pain in his feet since 2013, and stated that he was unable to walk long distances because of the pain. (R. 685). Mr. Collier also complained of lack of grip strength and severe

tingling, numbness and pins and needles sensation in his hands. (R. 685). Mr. Collier stated that there were no clear triggers, and no association of symptoms with his neck position or movement. (R. 685). Dr. Decker's physical exam returned normal results, except that Mr. Collier had decreased light touch and pinprick sensation in his toes, and had a narrow gait. (R. 687). His other sensations were noted to be intact. (R. 687). Dr. Decker diagnosed peripheral neuropathy, and ordered further imaging and testing. (R. 687).

Mr. Collier's lower nerve conduction report dated April 3, 2014 demonstrated mild bilateral neuropathy of the mixed type and mild reduction of sensory nerve action potential. (R. 474). A nerve conduction report dated April 8, 2014 revealed bilateral, mild to moderate nerve compression neuropathy of the wrists, consistent with carpal tunnel syndrome. (R. 479). Dr. Decker recommended wrist splints and wrist exercises, and noted that he suspected that the pain, weakness and stiffness in Mr. Collier's hands was mostly caused by arthritis. (R. 479).

On September 15, 2014, Mr. Collier saw Dr. Decker for a follow-up appointment, and at this visit complained of extreme pain at the base of his thumb, which Dr. Decker diagnosed as Dequervain's syndrome. (R. 498–500). At this appointment, Dr. Decker noted decreased grip strength bilaterally, with otherwise full power in the upper and lower extremities, and again noted Mr. Colliers' decreased sensation in his toes. (R. 500). Dr. Decker increased Mr. Collier's dosage of Neurontin, and stated that if the symptoms persisted, they would consider changing Mr. Collier's medication. (R. 501).

On November 8, 2016, Dr. Decker completed a physical functional capacity assessment for Mr. Collier in connection with his benefits application. (R. 736–42). As a preliminary matter, Dr. Decker noted that he had treated Mr. Collier only between March 18, 2014 and September

15, 2014. (R. 736). Dr. Decker stated his diagnosis of peripheral neuropathy, and attached the nerve conduction reports and clinical support for his findings. (R. 736). Dr. Decker stated that Mr. Collier mainly suffered from pain and lack of strength in his hands and feet, along with numbness in his toes, aggravated by walking and worse at night. (R. 736–37). Dr. Decker identified wrist splints and heating pads as devices Mr. Collier used to relieve the pain, and stated that he expected Mr. Collier's symptoms to last at least twelve months. (R. 738). Dr. Decker opined that Mr. Collier's impairments were consistent with his symptoms, which he estimated to have started in 2012. (R. 738). He opined that these symptoms were severe enough to interfere with Mr. Collier's attention and concentration "constantly" (defined as over 2/3 of an 8-hour workday), and stated that he believed Mr. Collier to be incapable of even low stress work. (R. 738–39). Dr. Decker opined that Mr. Collier was limited in his ability to sit or stand for any extended period of time without needing a break, and that he believed Mr. Collier would need to take a five to ten-minute break every fifteen to twenty minutes of work. (R. 739). Dr. Decker stated that Mr. Collier could never lift over five pounds, and would only be able to use his hands 20 percent of the workday. (R. 740). He concluded that Mr. Collier would be absent from work more than three times per month and that Mr. Collier's difficulty hearing and need to avoid noise affects his ability to work at a regular job on a sustained basis. (R. 741–42).

### c) Dr. Steven Kase, SSA consultative examiner

On October 6, 2014, Mr. Collier presented to Dr. Steven Kase, an ENT and allergy specialist, for a SSA consultative examination. (R. 348–49). Dr. Kase described Mr. Collier's medical background as including a history of noise exposure working in construction and 17 years of severe tinnitus with hearing loss. (R. 348). He noted that all of Mr. Collier's attempts at

controlling the tinnitus had failed, including specialized hearing aids.  (R. 348).  Mr. Collier also described intermittent dizziness, especially when his ears were clogged, and neuropathy in his legs, along with back problems.  (R. 348).

On physical examination, Mr. Colliers' ears, nose, and throat were normal, other than a deviated septum and postnasal drip.  (R. 348).  Dr. Kase reviewed an audiometric evaluation, which revealed mild hearing loss in low and low-mid frequencies, and a severe sensorineural hearing loss in high frequencies.  (R. 348–49).

Dr. Kase concluded that Mr. Collier was moderately disabled by this level of hearing loss, which likely accounts for his severe tinnitus.  (R. 349).  He also noted that this level of tinnitus is emotionally disturbing and could increase his level of disability to severe.  (R. 349).

### d)  Dr. Catherine Pelczar-Wissner, SSA consultative examiner

On October 16, 2014, Dr. Catherine Pelczar-Wissner conducted an internal medical examination in connection with Mr. Collier's SSA application.  (R. 342–45).  At the time of the examination, Mr. Collier was 48 years old and chiefly complained of peripheral neuropathy and generalized pain.  (R. 342).  Dr. Pelczar-Wissner noted that an MRI of Mr. Collier's lower lumbar spine showed degenerative changes, and stated that the diagnosis for the peripheral neuropathy was unknown, and that Mr. Collier had great difficulty walking.  (R. 342).

Mr. Collier stated that he cooked and did laundry three times a week, and took care of his kids five days a week.  (R. 343).  He stated that he was able to take care of his personal hygiene, and liked to watch television in his free time.  (R. 343).

Dr. Pelczar-Wissner's physical examination found no acute distress, but a very antalgic gait and noted again that Mr. Collier was taking very small steps.  (R. 343).  Mr. Collier could not

walk on his heels and toes, could not squat, and needed help getting on and off the exam table, although he was able to change for the exam himself and rise from the chair without difficulty. (R. 343). Dr. Pelczar-Wissner noted limited range of motion in the lumbar spine, and full range of motion in the shoulders, elbows, forearms, wrists, hips, knees, and ankles, bilaterally, and that the joints were stable and nontender. (R. 344).

The neurologic exam revealed some sensation with light touch, but a marked amount of hyperesthesia on light touch of the extremities distributing up past the mid-calf. (R. 344). Dr. Pelczar-Wissner found Mr. Collier's hand and finger dexterity to be intact, with full grip strength in both hands. (R. 345).

Dr. Pelczar-Wissner diagnosed Mr. Collier with severe peripheral neuropathy (with unknown etiology), borderline diabetes, severe tinnitus, numbness in hands and feet, hypertension, and degenerative disease of the lumbosacral spine. (R. 345). She opined that his prognosis was stable, but that he had a marked restriction for walking, balancing activities, and climbing stairs, steps, uneven terrain, and ladders. (R. 345). She also noted that it would be difficult for Mr. Collier to carry heavy items due to his difficulty walking. (R. 345).

**C. Administrative Proceedings**

**1. Hearing before the ALJ**

On November 8, 2016, ALJ Gonzales held an evidentiary hearing, at which Mr. Collier was represented by an attorney. (R. 37). ALJ Gonzales reviewed the record exhibits and explained the nature of the hearing. (R. 37–39).

Mr. Collier explained that due to his tinnitus, his construction work was limited to operating machinery that had enclosed and soundproof operator chambers. (R. 44). In 2009, he

stopped working in order to spend time with his dying mother, and when he tried to return to work in 2011, the company had sold several of its specialized machines with soundproof chambers and did not have work available that Mr. Collier could perform.  (R. 43, 46, 48).

Mr. Collier testified that he was able to take care of many activities of daily living independently—he cooked several times a week, tried to help around the house, and was able to take care of his young children.  (R. 53).  However, Mr. Collier stated that he could no longer do yard maintenance or help with chores like sweeping.  (R. 53).  Mr. Collier also testified that he still occasionally went hunting and fishing, although he was much more limited than he used to be.  (R. 50–52).

Mr. Collier described how his impairments impacted his ability to work, first discussing the tinnitus, which he experienced constantly, and which caused hearing loss and periods of nausea and headaches.  (R. 59–60).  Due to the tinnitus, he was also unable to work in complete silence, as the ringing in his ears would cause distractions and impact his ability to concentrate.  (R. 60–61).  Mr. Collier also described foot problems, and stated that he could only walk for about ten minutes before needing to rest.  (R. 62).  Additionally, his foot problems, including soreness and numbness, occasionally caused him to stumble and lose his balance.  (R. 63).  Mr. Collier also explained that he had difficulty holding onto and grabbing objects.  (R. 69).  When asked what precluded Mr. Collier from exploring other, non-physical employment, he explained that he did not know how to use a computer, and that he had difficulty with his memory, and difficulty sitting still.  (R. 73–74).

After the ALJ and Mr. Collier's attorney finished their questioning, vocational expert Jessica Christensen testified.  (R. 77).  Mrs. Christensen first classified Mr. Collier's past work as

"Operating Engineer" with a DOT code of 859.683-010. (R. 78). Mrs. Christensen explained that the physical demand per the DOT for this position was "medium" but as actually performed by Mr. Collier was "heavy." (R. 78). Based on Mrs. Christensen's review of the record and Mr. Collier's testimony, the ALJ asked Mrs. Christensen two hypothetical questions. The ALJ first asked her to consider a person of Mr. Collier's age, education, and work history, with the residual functional capacity to engage in light exertional work, except that the person was limited to working in places with moderate noise, precluded from working at unprotected heights, and climbing ladders, ropes or scaffolds, precluded from kneeling or crawling, but with the ability to handle and finger bilaterally, and could occasionally balance, climb stairs, walk on uneven terrain and stoop. (R. 78–79). Mrs. Christensen opined that such an individual would not be able to engage in Mr. Collier's past work, but that there were other jobs in the national economy in significant numbers that such a person could perform, such as mail clerk, router, and garment sorter. (R. 79). The ALJ then asked the same hypothetical, but this time with the individual only able to engage in sedentary, verses light exertional, work. (R. 80). Again, Mrs. Christensen stated that such an individual could not perform Mr. Collier's past work, but that such a person could perform jobs such as inspector, surveillance monitor, charge account clerk, or order clerk. (R. 80–81). Mr. Collier's lawyer then asked the vocational expert several questions, and confirmed that six months of two unpredictable absences a month and being off-task for fifteen percent of a workday would both preclude all work. (R. 81–82). The attorney then asked if there were jobs in the national economy that have no noise and no auditory stimulus, to which the Mrs. Christensen replied that there were none. (R. 83).

### 2. **The ALJ's decision**

On June 12, 2017, ALJ Gonzales issued his decision denying Mr. Collier's application for DIB. (R. 16–30). He held that, "after careful consideration of all the evidence," Mr. Collier was not disabled as defined in the Act during the relevant time period. (R. 19).

ALJ Gonzales followed the five-step disability determination process. As a preliminary matter, the ALJ found that Mr. Collier met the insured status requirements for his DIB application through December 31, 2014. (R. 21). At step one, ALJ Gonzales found that Mr. Collier had not engaged in substantial gainful activity since February 9, 2013, the alleged onset date, through the date last insured. (R. 21). At step two, the ALJ found that he had twelve severe impairments: tinnitus, carpal tunnel syndrome, diabetes mellitus, peripheral neuropathy, plantar fasciitis, calcaneal spur, lumbar degenerative disc disease, obesity, acute gouty arthropathy, diastolic dysfunction, Dequervian's syndrome, and hypertension. (R. 21).

At step three, the ALJ found that through the date last insured, Mr. Collier did not have an impairment or a combination of impairments that met or medically equaled the severity of one of the listed impairments in the Act. (R. 22). (The impairments listed in 20 CFR Appendix 1, Subpart P, Part 404 are known as the "Listings").

ALJ Gonzales assessed Mr. Collier's residual functional capacity as being able to perform sedentary work with the following limitations: Mr. Collier could only perform work in areas of no more than moderate noise exposure, could not work at unprotected heights, could not climb ladders, ropes, or scaffolds, could not kneel or crawl, but could frequently handle and finger, and was limited to occasionally crouching, stooping, balancing, climbing and descending stairs, and walking on uneven terrain. (R. 22).

At step four, ALJ Gonzales, found that Mr. Collier was not capable of performing his past work, but at step five, found that there were jobs existing in significant numbers in the national economy that Mr. Collier could perform. (R. 28–29).

### 3. The Appeals Council decision

Mr. Collier requested Appeals Council review, but by letter dated July 27, 2018, the Appeals Council found no reason to review the ALJ's decision and denied the request. (R. 1).

## II. DISCUSSION

### A. Standard of Review

Under Rule 12(c) of the Federal Rules of Civil Procedure, a party is entitled to judgment on the pleadings if he establishes that no material facts are in dispute and that he is entitled to judgment as a matter of law. Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999); Morcelo v. Barnhart, No. 01 Civ. 743 (RCC) (FM), 2003 WL 470541, at *4 (S.D.N.Y. Jan. 21, 2003).

The Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A court may set aside the Commissioner's decision denying SSI benefits if it is not supported by substantial evidence or was based on legal error. Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009). Judicial review, therefore, involves two levels of inquiry. First, the Court must decide whether the ALJ applied the correct legal standard. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ. 4254 (SCR) (MDF), 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008). Second, the Court must decide whether the ALJ's decision was supported by substantial evidence. Id. "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the

evidence must also include that which detracts from its weight." <u>Longbardi v. Astrue</u>, No. 07 Civ. 5952 (LAP), 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Burgess v. Astrue</u>, 537 F.3d 117, 127 (2d Cir. 2008) (internal citations omitted).  The substantial evidence test applies not only to the factual findings, but also to the inferences and conclusions drawn from those facts.  <u>See</u>, <u>e.g.</u>, <u>Carballo ex rel. Cortes v. Apfel</u>, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999).  In determining whether the administrative record contains evidence to support the denial of claims, the Court must consider the whole record, and weigh all evidence to ensure that the ALJ evaluated the claim fairly.  <u>See</u>, <u>e.g.</u>, <u>Brown v. Apfel</u>, 174 F.3d 59, 62 (2d Cir. 1999).  The Commissioner, not the Court, resolves evidentiary conflicts and appraises the credibility of witnesses, including the claimant.  <u>See</u>, <u>e.g.</u>, <u>Veino v. Barnhart</u>, 312 F.3d 578, 588 (2d Cir. 2002); <u>Clark v. Comm'r of Soc. Sec.</u>, 143 F.3d 115, 118 (2d Cir. 1998).

Disability-benefits proceedings are non-adversarial in nature, and therefore, the ALJ has an affirmative obligation to develop a complete administrative record, even when the claimant is represented by counsel.  <u>See</u> <u>Lamay v. Comm'r of Soc. Sec.</u>, 562 F.3d 503, 508–09 (2d Cir. 2009). To this end, the ALJ must make "every reasonable effort" to help an applicant get medical reports from her medical sources.  20 C.F.R. § 404.1512.  Ultimately, "[t]he record as a whole must be complete and detailed enough to allow the ALJ to determine the claimant's residual functional capacity." <u>Casino-Ortiz v. Astrue</u>, No. 06 Civ. 155 (DAB) (JCF), 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007).  When there are inconsistencies, gaps, or ambiguities in the record, the regulations give the ALJ options to collect evidence to resolve these issues, including re-

contacting the treating physician, requesting additional records, arranging for a consultative examination, or seeking information from others.  20 C.F.R. § 404.1520.

The Act authorizes a court, when reviewing decisions of the SSA, to order further proceedings:  "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g); Butts v. Barnhart, 388 F.3d 377, 382 (2d Cir. 2004).  If "'there are gaps in the administrative record or the ALJ has applied an improper legal standard,'" the court will remand the case for further development of the evidence or for more specific findings.  Rosa, 168 F.3d at 82–83 (quoting Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)).  Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision.  Pratts, 94 F.3d at 39.  If, however, the reviewing court concludes that an ALJ's determination to deny benefits was not supported by substantial evidence, a remand solely for calculation of benefits may be appropriate.  See, e.g., Butts, 388 F.3d at 386 (discussing Curry v. Apfel, 209 F.3d 117, 124 (2d Cir. 2000)).

### B.  Standards for Benefit Eligibility

For purposes of DIB, one is "disabled" within the meaning of the Act, and thus entitled to benefits, when he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(3)(A).  The Act also requires that the impairment be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."   42 U.S.C. § 1382c(3)(B).   In reviewing a claim of disability, the Commissioner must consider:   "(1) objective medical facts; (2) diagnoses or medical opinions based on those facts; (3) subjective evidence of pain and disability testified to by claimant and other witnesses; and (4) the claimant's background, age, and experience."   Williams ex rel. Williams v. Bowen, 859 F.2d 255, 259 (2d Cir. 1988); 20 C.F.R. § 404.1527.

Under SSA regulations, disability is evaluated under the sequential five-step process set forth in 20 C.F.R. § 404.1520(a)(4)(i)–(v).  The Second Circuit has described the process as follows:

> First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity.  If not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on the medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the Claimant could perform.

Bush v. Shalala, 94 F. 3d 40, 44–45 (2d Cir. 1996) (quoting Rivera v. Schweiker, 717 F.2d 719, 722 (2d Cir. 1983)).

At the first four steps, the claimant bears the burden of proof.  At the fifth step, the burden shifts to the Commissioner to demonstrate that there are jobs in the national economy that the claimant can perform.  See, e.g., Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).  In meeting the burden of proof at the fifth step, the Commissioner can usually rely on the Medical-

Vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, known as "the Grid." Zorilla v. Chater, 915 F. Supp. 662, 666–67 (S.D.N.Y. 1996).

## C. Evaluation of the ALJ's decision

The ALJ evaluated Mr. Collier's claim pursuant to the five-step sequential evaluation process outlined in 20 C.F.R. § 404.152(a) and concluded that he was not disabled within the meaning of the Act. (R. 19). The Court finds that ALJ Gonzales's decision applied the correct legal standards and was supported by substantial evidence.

### 1. Testimony of a medical expert

Mr. Collier submits that "[a]t the very least, the ALJ should have obtained a [medical examiner] to determine whether Plaintiff's impairments equal[ed] a medical listing," and argues that remand is warranted for failure to do so. (ECF No. 15 at 9). As Mr. Collier notes from the citations to various administrative decisions, however, an ALJ "may ask for and consider evidence from medical experts," but is not required to do so in most situations. (Id.) (emphasis added). As the Commissioner noted, there are three instances where an ALJ must obtain a medical expert: (1) if ordered to do so by the Appeals Council or federal court; (2) if there is a question about the accuracy of a medical test result's report that requires an evaluation of background medical data, and (3) if the ALJ is considering finding that the claimant's impairments medically equal a listing. (ECF No. 17 at 15 (citing Hearings, Appeals, and Litigation Law Manual ("HALLEX") I-2-5-34)). None of these situations existed in Mr. Collier's case, and thus the ALJ was not required to seek the testimony of a medical expert. As the Commissioner also noted, Mr. Collier does not identify which Listing he supposedly met, and for which the ALJ should have ordered further testimony. (Id. at 15). Accordingly, and pursuant to the Court's finding, discussed further

below, that the ALJ properly evaluated the medical evidence, the Court declines to remand for failure to seek medical expert testimony.

### 2. **Treating physician rule**

Mr. Collier also argues that ALJ Gonzales failed to properly apply the treating physician rule. (ECF No. 15 at 10). Mr. Collier attempts to rebut the ALJ's conclusion that Mr. Collier's treating physician's opinion was "not consistent with the record as a whole," by pointing to limited examples where Dr. Ceccarelli's opinions align with record evidence. (ECF No. 15 at 10–11). Simply because other doctors assessed certain similar limitations, however, does not require the ALJ to afford controlling weight to a physician's opinion that is not supported by his own treatment records or the record as a whole.

The SSA regulations require the ALJ to give "controlling weight" to "the opinion of a claimant's treating physician as to the nature and severity of the impairment . . . so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Burgess, 537 F.3d at 128 (internal citation omitted); accord Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 426 (S.D.N.Y. 2010). "This preference is generally justified because treating sources are likely to be 'the medical professionals most able to provide a detailed, longitudinal picture' of a plaintiff's medical impairments and offer a unique perspective that the medical tests and SSA consultants are unable to obtain or communicate." Correale-Englehart, 687 F. Supp. 2d at 426 (quoting 20 C.F.R. § 416.927(c)(2)).

If the ALJ determines that a treating physician's opinion is not controlling, he is nevertheless required to consider the following factors in determining the weight to be given to

that opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence provided to support the treating physician's opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is from a specialist; and (6) other factors brought to the Commissioner's attention that tend to support or contradict the opinion. 20 C.F.R. § 416.927(c). The ALJ must give "good reasons" for not crediting the plaintiff's treating physician. 20 C.F.R. § 416.927(c)(2); see Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (explaining that Appeals Council had "an obligation to explain" the weight it gave to the opinions of the non-treating physicians). After considering these factors, the ALJ must fully set forth his reasons for the weight assigned to the treating physician's opinion. Burgess, 537 F.3d at 129. ALJ Gonzales did just that, and even sent a supplemental questionnaire to Mr. Collier's treating physician, Dr. Ceccarelli, to further inquire into these factors. (R. 744).

ALJ Gonzales carefully reviewed the medical and opinion evidence and supported his findings with detailed discussion and citations to the record. In his analysis, ALJ Gonzales specifically noted that Dr. Ceccarelli was Mr. Collier's treating physician, and then assessed the relevant factors when he determined that he was not going to afford Dr. Ceccarelli's opinion controlling weight. (R. 27). ALJ Gonzales was quick to note that there was no doubt Mr. Collier had severe impairments and was limited in some ways, but ultimately concluded that Dr. Ceccarelli's opinion that Mr. Collier could not perform even low stress work was unduly limited based on his own treatment records and the record as a whole. (R. 27). ALJ Gonzales carefully included Mr. Collier's limitations in his residual functional capacity assessment. (R. 19–30)

As required, the Court also reviewed the entire record, considered evidence from both sides, and concluded that the substantial evidence supports the ALJ's decision. Thus, his findings are conclusive. <u>See</u> 42 U.S.C. § 405(g) (the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive."); <u>Longbardi</u>, 2009 WL 50140, at *21 ("In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."). As the Commissioner points out, "[t]he issue is not whether there is evidence—even substantial evidence—that supports the Plaintiff's position. Rather, this Court need only assure itself that substantial evidence supports the ALJ's decision." (ECF No. 17 at 26). The Court is satisfied that ALJ Gonzales's decision is supported by substantial evidence in the record, such that a remand for further evidentiary proceedings is not appropriate.

### III.    <u>CONCLUSION</u>

For the reasons set forth above, the Commissioner's motion (ECF No. 16) is GRANTED and the Plaintiff's motion (ECF No. 14) is DENIED.

The Clerk of Court is respectfully directed to close the Motions at ECF Nos. 14 and 16, and to close this case.


Dated:     New York, New York
           March 17, 2020

                                        SO ORDERED

                                        _____
                                        SARAH L. CAVE
                                        United States Magistrate Judge